I would like to reserve three minutes for rebuttal. This case involves a land exchange that Kaiser applied to BLM for approximately 18 years ago. Can I ask you a question? Certainly. Look through the record. The record in this thing goes from here to the door. Indeed it does. And you've got pictures in there. Who can tell what those pictures are? They're Xerox copies of Xerox copies, and there's a lot of darkness over there. And we tried to get some pictures, but maybe they all went to some dump someplace. We don't have them. Do you have pictures to show us so we can see this place? If I may... You want to see the eagles on Eagle Mtn? Your Honor, first, please let me apologize for the state of the administrative record. Apparently what happened was there was the one original record that had the color copies, and one copy was made of that. The original was then put aside, as it always is, for safekeeping reasons. The problem was, as it appears, the original, from which every copy thereafter was made, had blurred copies. And every copy everyone possesses were the blurred copies, unfortunately, that you received. What I did bring, and I have copies for the panel and for opposing counsel, it's the best copy that I, and I actually had problems getting colored copies, but I think this will give you a representation of the lands. It shows the lands in color, the BLM lands, not the Kaiser lands, I apologize, but the BLM lands that were slated for exchange. It shows the mining area, so would you like to make that available? You gots better than nothing. I understand, yeah. So where is this file now? I'm sorry? Where is this original file? The main BLM, the magical place, I'm sorry, I don't know exactly which office it's in, but it's more or less under lock and key, and the understanding we had was if the court had particular pictures in mind, someone would fish through the 49,000 pages of the record. How could we have anything particular in mind if we can't tell what's there? Well, Your Honor, some of the pictures, there are pictures that are blurry, but the ones, for example, that lay out the land areas were clear, though the coloration wasn't available to the court, but I think hopefully this will assist you. Well, yeah, I'd like to see. Just to orient us on this, where's the town, little town? The town site? Yeah, just so I can. That is to the, of the colored portion, do you see the white box? Okay, down here. Yeah, and you can see the arrow, if you move to the left. Oh, yeah, okay. Are you with me? Yeah, that's the town site. That's the town site. I'm sorry? Unified School District. Well, that's what the sign says. That was to orient you of the location. If you look at the writing to the far left bottom, it says town site. It says town site specific plan boundary. That's to give you an idea of where that land is. And if I could just, while you're looking, the areas in green designate the BLM lands that were being offered in the exchange. So, as you can see, those fragmented scattered pieces of land around the pictures, those are the BLM lands that were being offered. And where are the Kaiser lands that are given in swap? I'm sorry, this doesn't show. It doesn't show that? Those are elsewhere. No, correct, correct. There is an administrative record page, which I'm sorry I don't have for you, but I can make available to you after argument to show the few pieces of Kaiser land. But, in all honesty, those really aren't in dispute as much as the BLM lands are, which is why I thought this picture would be beneficial. Where do the goats hang out? I'm sorry? Where do the mountain goats hang out? Pretty much anywhere they want, if I'm not mistaken. One last orientation question. Where's Joshua Tree? Joshua Tree is, in essence, this upper portion going to the northwest, very northwest. A mile and a half away. A mile and a half. Yeah, yeah. That's the crow flies. Northwest on this. Yes, and so it covers, I'm sorry, I have no scale for you. It doesn't extend very far over to the northeast, if I'm not mistaken. What about the common raven? That's the common raven who can't get to the refuse because there's not only six inches of soil cover, but there will be additional inches if they're required. I like the non-lethal plan to keep the common raven away. Well, we need our species. Okay, let me jump right into this. Where's Fontana from here? I'm sorry? Fontana. I don't know what Fontana is. Well, that's where Kaiser had its steel mill. Oh, okay. And I was buying steel from China. Okay. You didn't know that? No, I'm sorry, I didn't. Kaiser had a big steel mill in Fontana, and it got the ore out of these mines. Understood, understood. And then the plant was closed down. It was a disaster for the town. And the steel mill was sold, lock, stock, barrel, to China. And they came in and dismantled it and put numbers on everything and took it away. Understood. Not bad, is it? Yeah, well, since Kaiser first applied for this land exchange, as I said, approximately 18 years ago, BLM and Kaiser have conducted and reconducted extensive analyses to both identify and assess the potential impacts of not only the land exchange, but also of the proposed landfill that Kaiser had also planned for and was hoping to undertake. Of all of those analyses, they've undergone several layers of judicial scrutiny. At this stage of the litigation, however, most of the issues arise under NEPA and FLIPMA. That's the Federal Land Policy Management Act. Use those words, you know, because you get all these acronyms. I know, I'm sorry. It's a time saver. Okay, but I'm with you. It's a time saver, but it makes me think of Campbell's vegetable soup, you know, with letters on it. The issue under the Federal Land and Policy Management Act of highest and best use is the issue in this case that's the most multifaceted and therefore is the most vulnerable to misapprehension. So I would just like to clarify three points for the court to assist it in resolving the issue of highest and best use. Can I ask you a couple questions? Sure. Tell me, you've got four open mining pits there? Yes. Okay. And this landfill is only going to fill up one of them? That's correct. How come it's only going to fill up one? Kaiser determined during all of the extensive analyses that were done, the pits, the other three pits, are closer to Joshua Tree National Park. These are generally in this. Where are the pits here so I can look? Okay, if you could peek at me so I don't have to describe. The central pit is in this area of red, kind of in the middle here. And then the two other pits are. Did I say pit? It says central. Central pit. Central pit. Where? Oh, central pit right here. Oh, okay, I got it. And if you look more to the left, going in the northwest direction, you'll see two other pits. One says, is it south? South pit. Yes, and Black Eagle North Pit. Those pits are located close. That's a big pit, huh? Yes, and they're closer to Joshua Tree National Park. The decision was made because of the proximity to the park that those pits would not be filled. And indeed, I think this would be a very different case if Kaiser had planned to fill those pits. But that's the reason. Where's the fourth pit? That's dead center right here to the right of the picture where you see in red, you'll see the designation East Pit. East Pit. That is the one that will be. Oh, here. Oh, way over here. Okay, I got it. The pit that we're talking about, which one is that again? Tell me. I'm sorry. The one ultimately that will be filled.  That's the one in. Oh, the East Pit. Yes, that's. And that's going to take how many years to fill? I don't recall exactly. 80 years, 90 years, 100 years? I'm sorry. Your Honor, it will. I thought it was like about 56 years before they start getting to the pit or something. That may. Something like that. It's at the end. Yes, that will not be. That's not the first area to be filled. That's what I understood, right? Correct. That's the East Pit. Yes. Yes. All right. Now the issue, as for the issue of highest and best use, I'd just like to preface my discussion. So why did you choose one pit? As opposed to the others. Yeah. As I said, the others are much closer to Joshua Tree National Park and therefore have a greater potential to have impacts that are adverse or ones that wouldn't be, well, adverse. It's the reason they're not being used. How much farther from the Joshua Tree is the East Pit than, say, the Central Pit? Your Honor, the squares that are present on this map are approximately, they are to represent about one mile square. So you can calculate, ultimately, perhaps at another time where I can do it for you if you'd like. Each square a section? Is that what it is? Yes. Yes. So, for example, the Black Eagle North Pit is, what is this? About a mile north. Well, not even that. Well, what it is, is it much- Half a mile north of the Central Pit. Central Pit. Yes, but the point is they're much closer to Joshua Tree and it was Kaiser's concern that it didn't want to fill garbage that close to Joshua Tree, so that's why those pits weren't chosen. The Central Pit, I mean the East Pit, is the one that's most distant from the park. As to the issue, though, of highest and best use, I simply- We get to Black Eagle and South Pit and Central Pit in the 23rd century. Okay. As for the issue of highest and best use, the first point that I'd like to preface my discussion by saying that the government is still of the position that this issue wasn't exhaustive before the IVLA, but I just want to get to the merits here of the argument today. The lands for which the highest and best use analysis was conducted are not the same lands for which the other issues in this case involved. What I mean to say is, for purposes of the National Environmental Policy Act, NEPA, and for FLIPMA, the- Well, let me just ask you questions, okay? You don't have much time. So, now the record tells us that the Big Horn Sheaf buffer zone is a key element of this mitigation plan, right? Okay. Okay. It also says that the buffer zone will provide habitat for the sheaf, right? Mm-hmm. So how can it be a buffer zone and also be a habitat? It's intended to serve dual purposes. The purpose was never to be a buffer where the sheep would never wander. It's a buffer that they can also use. It just has a dual purpose. Does it say that in these reports, it's dual purpose? Yes. Yes. The sites I have here are in Kaiser's Excerpts of Record, Volume 6, pages 171 and 191. It says the buffer zone would consist of habitat for the Big Horn Sheep and would remain as natural open space around the periphery of the proposed landfill. If you like, Your Honor, I can get you a better site, but in the government's briefing, we do address that exact issue, that it's to serve a dual purpose. Approximately 6171. Well, it's hard for me to visualize. You'd have a dual purpose. I mean, you'd have a buffer zone. When I think of a buffer zone, I think of keeping stuff out of there, and then you'd have it for the sheep. OK. In the brief, you talk about the desert tortoises, the air quality, and other environmental impacts. But where do you talk about entralfication? Butrification? Butrification. Butrification. That's in the brief as well. In one place? In the opening brief. I don't even have my pages. I can get that for you. Did you have a particular issue, or do you want to know where? Where? I'm sorry, Your Honor. That's at page 59 of the government's opening brief, is where that analysis and the arguments are presented. Getting back to... I'm talking about the record, not the brief. OK. We're in the record itself. Well, eutrophication, you might not find the term per se, and that may be the problem. In eutrophication, though, the definitions are somewhat... You don't have a section in the record where you talk about eutrophication. It almost... Right. No, and that's... Oh, you're talking about nitrification. Nitrification, right. It's because by the definition... I know what you talk about, but you don't have one place in the record where you just take that subject up. No, it's... That's all I'm asking you. OK. No, you won't find the word. I know you talk about it. I simply want to... Yes, I want... It's likely you won't find what addresses nitrogen impacts to the environment, and that's what eutrophication is. So, OK. I mean, when you... Now, all the alternatives that were considered, they all involve a landfill in the Eagle Mountain area, don't they, that the ELM considered? All of... There's the no action alternative, which wouldn't involve it, and I believe there may be another alternative for which a new landfill was not part of the alternative. I mean, your purpose... They could just put the landfill on their own property. Right. Correct. It would be much smaller. Right. Are you asking... I'm sorry, did you have a question to follow up with? No, you have the purpose and need statement, right? Yes. That's rather narrowly drawn, isn't it? No, the purpose and need statement actually defines what the purpose and need of the underlying action was, and the underlying action was... It says the goals are landfill development, income stream from a landfill from a mine site, use of the tailings. That's the stuff that was discarded when the ore mine was operating. They all seem to require a landfill, don't they? I'm sorry, where were you reading from, Your Honor? The purpose and need statement is... I'm reading from my notes. Okay, the purpose and need statement is provided at Kaiser's Exhibit of Record at Volume 5, page 21. But all those point to the use of this property as a landfill. That is the purpose. That's what was being proposed by Kaiser, and it would be disingenuous for the purpose and need statement to not include that. So, indeed, yes. What other things are the purpose and... How about just holding the land for speculative purposes? That's not what was being proposed. The purpose and need statement is not to assess what possibilities are available. That's not a projectory or speculative statement. It's meant to be a brief statement of actually what is the underlying action that the agency is looking at. Well, the underlying action here was the exchange. The underlying action was the exchange. That's why BLM is involved, because the government owns that land, and Kaiser comes to the government and says, hey, you know, we've got a deal for you. Yeah, well, you've got these scattered pieces of land out there. We've got a deal for you. And... We want to exchange. Right. We want to exchange with you. Right. But that's not it. And, again, I think the court would find that disingenuous. To what extent does the government have an obligation? You know, there's certain policies that underline the Federal Land Management Policy Act relating to these exchanges. Right. To what extent does the government have an obligation to factor in those underlying policies with a proposal to exchange? The government has an obligation to fulfill those statutory regulatory requirements all the time. They don't necessarily have to be included in the purpose and needs statement. Otherwise, or perhaps there could be a boilerplate statement in each purpose and needs statement that says, as we conduct this analysis, we will abide by every statutory and regulatory obligation. The purpose and needs statement didn't have to say what BLM has to do by law. That's a given. What it is to inform is what is it that BLM is doing other than abiding by its statutory and regulatory obligations. And, here, it was not only the land exchange, but BLM was also looking at the proposed landfill. And, clearly, that needed to be, had to be, in the purpose and needs statement. Well, but there is still, isn't there an overlying, you know, the public interest kind of concern that the BLM must also? That's a separate analysis and does not, that's under the Federal Land. And I realize that, but the two have to work together. Indeed, they do. And BLM has to function by meeting all of its obligations. Because it looks like, you know, you look at this, you know, I haven't spent the time that you have. It's a humongous record. Right. There's only so much we can look at. I understand. Along with all the other cases. You've only got one life to give to the United States. I hear you. But. I understand. You know, look, you're right. Kaiser came to BLM and said, I guess, I don't know, maybe they had some side meetings ahead of time. But it looks like Kaiser had this plan for using this area. And went to BLM and said, here's what we want to do. And we need your help to do this. Now, it's not necessarily we need your help. We have a proposal for you. A proposal? We need your help. They didn't want to do it. They didn't want to construct, as I understand it, they didn't want to develop a small landfill on their own property. They could have. They could have. No, but they didn't. They wanted to maximize their investments. There was rugged, there was BLM land surrounding them that was rugged, mountainous terrain. It is on record that that's how this land is described. 60% of this land is steeply sloped, mountainous land. And indeed, Kaiser said, we've got a landfill here. You've got some land that surrounds us. May we use that land? Okay. We don't have a picture of that, do we? What you're talking about. You have a picture of where the land is. I've not given you a picture of the topography. You could have gone very easily and Googled it and just taken, you know, you can take pictures of any place in the world today. Right? Google Earth. Google Earth. Yes, well, Your Honor, at this point, what we have is the description that it's rugged, mountainous, steeply sloping terrain. What does that mean? If you live in the Midwest, you know, if it goes up 100 feet, it looks rugged and mountainous. Understood. The point is 60%, about 60% of the BLM land is not flat. And it's the 60% of the land that Kaiser was looking to acquire. And the 60% of the land for which the highest and best use analysis was done was to look at what's the best use of this. You've been wanting to talk about highest and best use. And so that's one of the issues that Judge Timlin was concerned about in the summary judgment ruling. And the complaint is that in making that, those appraisals, they didn't factor in a landfill. That's the assumption. As a highest and best use. You know, as a reasonable use of the land. If I may refer you to Kaiser Lexus Rectory, Volume 4, Page 59. And that's where the government's appraiser, Mr. David Yerke, addresses highest and best use. Nowhere in there does he say that the analysis of highest and best use did not look at a landfill or at the projected landfill. Where does it say he didn't? It doesn't. It doesn't. I'm simply making the point that it doesn't say that he excluded it. And indeed, he doesn't list, unfortunately, what he included or what he excluded. What he does say at Page 59. Maybe in the broader public interest there was a real need for a humongous dump out there for Southern Californians. But, you know, they got a pretty good deal here because I understood the record here. Because I understood it. After they acquired all the land, got the land, they then negotiated a deal with L.A. County Sanitation District, which they reaped a substantial profit. There's a potential for profit. It seems very, you know, quite significant. It seems like the government got a bad deal. If I may, land appraisals are done from the perspective of the open market. They're not done from the perspective of a single entity or unit. Single entity or person who has an interest in the land. The government is not speculative in that way. I understand that. But it just seems like if you factored in a land dump, a landfill, the value of the land would have been higher. Well, Your Honor, if I may. That's the desert case. I understand that's the point that the planters are making. But if I could just take you a step down that slippery slope. You or an individual or an environmental organization wants to exchange land with the government. The government asks, what are you going to use it for? And the environmental organization says something. And they're going to earn a couple of dollars on it, millions of dollars. Who cares? They're going to earn some money. So the government says, oh, well, you're going to be making a profit. We're going to charge you more money for this land. We deem this land to be more marketable. There's now a market demand because this one organization wants the land. And so they'll extract. The government will then be justified in extracting a larger amount of money from that environmental organization based solely on the fact that that organization wants to buy the land and has a proposal for it that might end up yielding money. I understand the point you're making. But that's the real world, isn't it? That's not how appraisals are supposed to function. And I don't think we want the government doing that. We don't want the government acting as I might when I'm selling my house and I know that you want to put something on it that's going to yield a lot of money. I will try to get as much money from you as I can. I don't think we want the government. Why shouldn't the government do that as well? Because it may work, let's say, to the advantage of the government, which one might argue in this case because we have a company, but it might hurt others as well. And we don't want the government sucking money out of the pocket. You're misunderstanding, I guess. Okay, I'm sorry. You know, because in this, they well knew that in the desert area from Southern California on down to San Diego, that the desert area had become possible locations for landfills. Not only here in the Los Angeles area, but down in San Diego. You know, we had the other case, the desert, whatever, the desert, I forget the name, it went off the top of my head. That all became, this all was litigated in another issue. And they pointed, in that case, they pointed to Eagle Mountain. They said, look, these desert areas are being utilized. I understand. There's a market here. There is a market for desert land that in potential use is a landfill. Now, there are other, you know, I understand if you go to the regs and everything else, that there's supposed to be when you factor in potential uses, you're supposed to be legal, and it's supposed to be all the factors that come into play. Right. Well, if I may, highest and best use, again, is not, an appraiser doesn't go to the piece of land and say, I'm not going to look at the land. I'm not going to look at the physicality of the land. I'm not going to look at where it's located. I'm going to go and just start asking people, what does this community need? And then based on that, I will then assign a highest and best use. That's not how the, that's not how it's done. It's not an attempt to see what a community needs and then force that into the land that's being sold. It's actually the other way around. You go to the land itself first. Here, if you look at the picture, there are scattered fragments of land. The topography has been defined and described. The appraiser then casts a wide net. There's no regulation, no authority that says how wide the net has to be or what has to be included in the net of possibilities. But the appraiser then, having looked at the particularity of the land, then determines what impossible uses I'm going to look at. The government's appraiser here said that the four criteria to which you were referring, quote, are applied to every conceivable land use. That's what the appraiser here said. He didn't list them in deed, but he said it's applied to every conceivable land use and then you filter out. Things fall out. If the plaintiffs here were worried about a landfill and nothing had happened but they're there and they see these holes and they say, you know, someday they're going to put dumps here. Let's go to the BLM and see if they'll sell us the land, you know, for $77 an acre. We went to the BLM and said, we'd just like to have this land, you know. We want to just protect ourselves. You're telling me that the BLM would have sold it to them for $77, $20,000? $77 an acre. I'm sorry, and the people you have buying the land are interested in the land are? They're the people living there that are in that family that live nearby. They had $20,000 extra dollars? Sure. I see no reason why BLM would attach any different amount of money. Based on what the appraiser is showing and the land sales in that area, not looking regionally to find out what the region needs. Based on land sales of comparable types of land in that area, the land sales came out with a market value that the appraiser came up with. And it wasn't based on what is a regional market and then taking that and stepping backwards. Anybody can go out and find some public land or BLM land and say, yeah, we can buy some of that. BLM would sell it to them? BLM would conduct a land exchange analysis to determine if it would approve the process. And the land that was being appraised or was proposed for the land exchange would be assessed. And it would be assessed under appraisal standards which include, for example, for types of land like this in this area, what are people buying it for? We don't have evidence in the record that there's a market demand in Eagle Mountain to put a landfill. We don't have on record any sales taking place in there for a landfill. Nor do we have in the record any indication that on 60%- Do you need sales? I'm sorry? Do you need sales? In order- for one to assume that this is the highest and best use, it most certainly helps to have- Do you need sales? That's not my understanding. You know, when I used to do, what do you call them, when the government takes property? Condemnation. Condemnation proceedings. They'd come in with all kinds of possible uses for the property. Everything anybody could think of. Well, you can test your net widely initially, but- Once you start looking at the requirements of financial feasibility, and here, the only evidence that was brought in by Sharpeve later in the legal proceedings below, the only evidence of financial feasibility is they're saying Kaiser is willing to do it, so it must be financially feasible. That's not evidence. So where did Judge Timlin go wrong then? What's your bottom line? On this particular point. On this issue? First of all, it was not properly before the district court. Okay. Well, let me get over that hurdle. Where did he go wrong? Second, the highest and best use analysis that was ultimately before the court, all the papers before the court, clearly indicated that the highest and best use of these fragments of scattered land, BLM land, the highest and best use was not of a landfill, but was of speculative investment, which was the common and typical use of land in that area. Okay. So let me ask one just sort of a non-legal question, but just a practical question. What's the effect of his ruling? That is, suppose it were affirmed on appeal. Suppose we affirmed his judgment. On what? In general? No, just on, let's just take the highest and best use ruling that he made. What does that mean? BLM has to redo the appraisal? The court could, which actually, practically speaking, it makes no sense, but the court could remand for BLM to do what it's already done and what's already in the record and was before the district court, which was to expressly and exhaustively consider landfill use as a possible use of the exchange. And did that result in a higher value for the government, a higher price for Kaiser to pay? The analysis has already been done, and the feasibility of landfill use for these lands is not there. If the analysis is done, it's still not that landfill use is the highest and best use of this land. Okay. The district, all right, I've been very quiet because I want to take at least ten minutes of your time and explore something that I think is important, the gay-born sheep issue. There are a couple of issues that the district court dealt with in a paragraph after holding this case for two years and a half. Right. One of them is the sheep. Yes. So I focused among lots of things that I've been focusing on the sheep, and the court simply says big horn sheep, plaintiffs contend defendants failed to take a hard look at the proposed project's impact on big horn sheep. The court agrees. And then there's a useless paragraph, frankly, that explains why. Right. And some of it has to do with habitat and buffer zone. I looked in this record, and I find so much about big horn sheep it makes my head spin. There is extensive enough. Starting in the early 1990s, it appeared that big horn sheep were identified as a potential problem in this proposal. Is that right? And then there were all kinds of projects. Can you walk me through those? What's this project that was set up early on to study the sheep? They were putting telemetry collars on them, flying over them with airplanes, relocating them. What was done, and when was it done, and why was it done? As Your Honor has pointed out, there was a concern about impacts to big horn sheep. And some of the work done consisted of consultations with California Department of Fish and Game, which is the state regulatory agency that's responsible for the big horn sheep population. They were involved in all of the analyses. Let me be specific. It says they set up a research program designed to ensure that the landfill and its operating procedures would not negatively impact the Eagle Mountain big horn sheep herd or surrounding herds that together may comprise an East Mojave mega population. So they set up a program. And the monitoring program involves capturing sheep on the Eagle Mountain with radio telemetry collars, determining home ranges, seasonal area uses, inner mountain movements as related to the proposed landfill, the physical and biotic attributes of the study area, the relationships of big horn movements and movement quarters, and the relationships of the landfill, generic relationships of Eagle Mountain herd to herds in the Little San Bernardino and Coxcomb Mountains. So this whole project was set up. Seasonal location plots, physical attributes, and then they talk about the loss of 1,000 acres to be mitigated by new water resources through the purchase of additional lands with trust funds. So there's a trust fund set up for this. Absolutely. And then 644 acres of potential habitat would remain as natural open space around the periphery of the proposed landfill. The habitat would provide a buffer zone between the landfill operation and relocated sheep population. So they're going to relocate sheep. And then a specific condition is to keep dogs and other pets out of there. And then there's talk in other places of this buffer zone also having water things put in it so that it's also suitable habitat. So it is a dual operation thing. And then the trains are supposed to go through here slowly. And the fence is supposed to exclude tortoises but not sheep. Right. And on and on and on. I mean, this thing is crazy. It's a very intricate analysis. So all of these projects and these proposals, I mean, I won't sit up here forever and read these things to you, but I've got them all marked out here. And then they even change the numbers of sheep that they were catching. Now, was that all done before the draft EIS and the final EIS? This has been a progressive process, and I am not certain of the exact timing of when this all played out. But generally speaking, for all of the analyses here, they began roughly around the 18 years ago when Kaiser first made his proposal. And as time has gone on and the analyses, as I said in the beginning, have been conducted and reconducted, it's been refined and refined and refined. As impacts have been identified, they've been further studied. As judicial renderings come down and say more studies need to be done, more have been done. So it's a quite exhaustive analysis, and there's a reason why there are 49,000 pages in the record. And then there's a memorandum of agreement dated September 1, 1993, between the National Park Service, the California Department of Fish and Game, Mine Reclamation Corporation, to conduct a study of desert bighorn movements and habitat use. And then this goes on for pages, an investigation of the sheep, periodic surveys of radio telemetry of animals, progress reports in six-month intervals, a steering committee to review, submit quarterly invoices for payment to these, provide services of an expert, Charlie Douglas, to serve as principal investigator on this project, reimbursement. I mean, this goes on and on and on. The duration of this is 36 months, and I don't see, and I'm telegraphing this to the other side so they can tell me what I've missed. And then there's progress reports. Sheep captures were conducted during the first year with a total of 28 sheep captured and fitted with radio collars. The first capture was in June 93, 11 ewes and one ram. Animal mortality is exceedingly low. And I don't see how anybody can possibly say that they didn't take a hard look at the sheep situation and try to take reasonable measures to make sure that nothing in this project would impact. Your Honor, I appreciate the fact that you've gone through the record. I understand the difficulty of being faced with a record of this size, but there's a reason for it. And there is great detail in here. And part of the problem with the district court decision is that the court decided just to look and see the way out at the rod and the IVLA decision, and there is much more to this case than that. See, you're complaining that, well, wait a minute, you looked at just the rod and you didn't look at the IVLA decision. Aren't we supposed to look at everything? Yes, yes. Okay, that's the point. It's just the final action. This is why we have these law clerks. We're killing them. I know. Go through the record and find all the sheep. Go through the record and find the nitrates. Go through the record and find the tortoises. That's why I said I appreciate the point. What the heck is going on with the common ravens? How thick is this dirt that they're putting on all these ewes? How many ravens does it take to turn over a baby turtle and eat it? Have you got that? When I talk about appellate practice to lawyers, I say that, you know, I ask them a simple question. What are the three aspects of a successful appellate practice in terms of a case? They all know the first. Well, you have to write a brief, then you have oral arguments. Then their eyes cross when you come to the third. Well, the third is the excerpt of record, because we trust, but we verify. So we read all this stuff, and we read the district court saying the sheep thing stinks and the eutrophication thing stinks, so we have to go into the record and look and see whether that's supported one way or the other. And so it would be nice if when somebody's putting together the excerpt, instead of committing a landfill dump on us, which is what this ER turns out to be, that somebody sits down and says, which never happens, I'm going to take and I'm going to create an excerpt that particularly addresses in some identical way all the sheep problems, all the nitrate problems. Well, that's been done. The excerpt of record submitted by Kaiser is categorized. If you look at this, and they've done a fabulous job. It's categorized by, for example. I know, and I have all those broken out, but you have to dig around in this. Well, but categories are available, and, for example, there are volumes. You know, it'd be nice instead of just categories. Put it together. Well, they are in volumes. There are volumes specifically dedicated, for example, to bighorn sheep. That's what this is called, volume six, bighorn sheep. There you go. But then you have to dig all over the place and find other things not in six. Well, I understand, Your Honor. So Kaiser did all the work for you. And then you send stuff out to us, and we've got, you know, I like to look at the pictures. I like to visualize, see what's going on, and I look at the pictures, and I try to get the pictures. I do apologize. Yeah, I mean, this is the federal government. You've got all the power. You've got all the money. You've got everything, but you can't give up the pictures. Maybe they're with the INS. I don't know. I apologize, Your Honor. I do. And I hope that picture will be helpful. One of your jobs is to make our job easier. I understand. As you can. I understand. Not to come in there with a truckload of stuff and just dump it over there. I've got a half a room filled with that. As do I. I don't know what you're talking about. As for the pictures, Your Honor, I didn't. I simply assumed that the pictures that I had received had just been copies of the copies. I've had a lot of big environmental cases, bombing freeways and sewage plants, cases that went on for 20 years. But it was made easy. They brought it in. Here it is. Do you know how many cases we go through in a year? No, Your Honor, I don't. How many do you think? I wouldn't even think. Take a guess. No, I'd care not to. Who did? Please do tell me. I don't know. Probably the average judge spends some amount of time in, oh, maybe close to 500 cases a year. You know, or two a day. I appreciate it. I completely understand what you're saying. I apologize for the nature of the records submitted and the problems with the photos. I'm sorry. Where's the ROD on sheep? There's not a separate rod. The record of decision discusses sheep. Do you want to know where in the rod it's discussed? Yeah, because in the Kaiser volume, it has the rod and the record of decision with the introduction, rather the table of contents, and there's no reference to sheep. The table of contents of the rod doesn't reference sheep. Is that what you're saying? No, that's what I'm getting at. I'm sorry. No, well, I believe the rod might not be broken down in that way, but I can give, I don't have the rod in front of me. I can get you the page numbers at which bighorn sheep are discussed in the rod. I can I can either hand that to Mr. Feldman or I can submit it after argument. You get through this and probably the BLM will be Kaiser's first customer. OK, let's hear from who said the other 10 minutes. Leonard Feldman. David Christ is. Well, thank you. Here's that. Mr. Feldman used to clerk for Judge Ferris 20 years ago, and I just recognized his name. May still survive all that? OK. Judge Ferris would ask you how he survived a year with me. I don't know about that. OK. It's a pleasure to be back before the court. My name is Leonard Feldman, and I'm counsel for Kaiser Eagle Mountain Mine Reclamation. I want to start with the question that took up a lot of Ms. Browntree's time, and that's the record. When we were asked to represent Kaiser on appeal in this case, we had the same frustration, I think, that this panel has had. There's 56,000 pages of documents here, and the color photographs aren't colored anymore. So what we did is we went through those 56,000 pages and we divided them into volumes of the excerpts of record, including, for example, the bighorn sheep section. And if you look at the section on bighorn sheep, there's a portion of that that says excerpts of the record of decision. And so we took, I think it's maybe 10 pages of the record of decision with regard to bighorn sheep. We did the same thing with the IVLA decision. We did the same thing with the biological opinions that have been issued in this case with regard to sensitive and endangered species. And we made sure that this court would have some place that it could look, one place for eutrophication, one place for highest and best use, one place for bighorn sheep. And Judge Tribe, as you pointed out, there's a lot more there that we didn't include, but there's a lot that we did. And this case has been studied to death. Every single issue that could possibly be addressed has been addressed in every single different direction. So is this the last obstacle to getting the plan feel underway? This is it. All the other permits have been obtained from the county and the state. All the permits have been obtained. Every single state, federal, and local agency that was required for approving the projects has done it. Was this bighorn sheep's information pulled together in this fashion before the district court? No, it wasn't done. Because I got the impression the district court didn't even know what the bighorn sheep issue was after I looked at all of this stuff. You know, the district court had just issued an order that says I'm having trouble with bighorn sheep. You've got to think about that in advance, you know. I completely agree, Your Honor, and that's why when we started working on this case, that was the first thing we did. He got in 500, 600 cases at one time. But keep in mind, Your Honor, that when the issues were briefed in front of the district court, there weren't these five issues that the district court had trouble with. The plaintiffs filed complaints that challenged every single aspect. Tortoises, night lighting, everything that moves. But you bet. I mean, in order to put together volumes of an excerpt of record the way we did on appeal. That's what keeps your law firm in business. It's for some associates, Dizzy. Yeah. It was a shotgun style of briefing, and the lawyers that represented Kaiser in the district court did a very good job. But there were so many issues that it was understandable in some ways that the district court missed it. But the district court could have asked. The district court could have had oral argument. None of those things happened. And then we find. Why were there not oral arguments? The district court decided not to have oral argument. A lot of district courts don't have oral argument anymore. Well, they should have on this case. I think in some cases that's appropriate, but certainly not in this case. If the district court is sitting there with a draft opinion that says I have trouble with bighorn sheep on fencing issues and buffer zone issues, have oral argument. Look at the parties eye to eye and say what do you have to say about bighorn sheep? On the issue of the photographs, Your Honor, we're lucky, I think, that we also have access to the record in the state court appeal. And I was able to find two colored photographs. When I got a call from the clerk's office, I offered to e-mail those to her, and she then pursued the issue with the government's attorney. But I'm more than happy to provide copies of these. I apologize. I only brought two. And I can hand them up to the court. And we will, of course, file copies of that and provide them to plaintiff's counsel. But those show you what this property looks like. And literally it is an abyss. It is a very scarred and disturbed area of property. And as the state court of appeals noted, as the IBLA noted, as the BLM noted, it makes sense to put a landfill in this area because it avoids the need to disturb an area that isn't already disturbed. And that state court opinion is something that I want to focus on for just a second. Because it's really, I think, an incredibly important document in this case that hasn't been mentioned much, certainly wasn't featured in the district court's opinion. The state court of appeal applying CEQA addressed all, all of the environmental issues in this case. Specifically rejected arguments relating to, for example, Joshua Tree National Park. It was a unanimous decision of a state court in the same state in which this landfill will be located. And as we note in our brief, CEQA is, if anything, more demanding. Fourth DCA. That's right. If anything is more demanding than NEPA. And that's really the end of it. Except with regard to highest and best use. Which, of course, there's no state court or state law analog. On the issue of highest and best use, the answer to this court's questions can all be found in Mr. Herzog's analysis. That came after, though, right? It did. And the reason it came after was fairly obvious, I think. And that was because, first, the issue wasn't properly exhausted in the IBLA. Second, the Desert Citizens decision came out after the case was already in front of the district court. And so what you have is an agency that really did exactly what I think this court would want an agency to do when a court issues a new and important decision. It retained Mr. Herzog and it had Mr. Herzog do exactly the analysis that this court identified in Desert Citizens. And, of course, the agency didn't just have him do that. The agency then issued a final decision by the district manager approving Mr. Herzog's analysis. And that was part of the record of decision? It wasn't part of the record of decision because, of course, the rod is dated 1997. But it was a continuation of the procedure. Was there a motion before the district court to augment the record of decision to add this Mr. Herzog? There was a certification in the district court. What's that? Well, the certification is what the government submitted to the district court and to this court as well, saying this is what is and is not included in the administrative record. So Mr. Herzog, it was filed with the district court but it was labeled as not part of the record? It was labeled as the supplemental administrative record. And there is a specific certification which we cite in our papers where the agency, the U.S. government, said this is what's in the record and this is what's in the supplemental. And was the district court asked to consider, specifically asked to consider the Herzog report as part of his decision? Yes. Yes, he was. And what did he say about it? This is where I think we have difficulty, among other areas, with the district court's decision because the district court makes very clear in his ruling, first, that he considered the entire administrative record, second, that he considered everything that the parties submitted with their briefs, and yet he says that the analysis required in Desert Citizens is missing. And that's exactly what Mr. Herzog does. And Mr. Herzog explains, and I think this is a very important point as well with regard to the L.A. Sanitation District, that in fact when that sale goes through, it will be a loss. Not a profit, but a loss. Because BFI has invested about $45 million in this project and Kaiser, and this is all in the record, Kaiser has invested approximately $10 million, if not more. And this sale to L.A. Sanitation District, as Mr. Herzog explains, reflects a net loss. What did they do with that money? They put it into the permits, Your Honor. That's where the value is. And Mr. Herzog explains that in his declaration. He actually goes out and finds two comparable properties, both of which were being sold for landfill purposes. And he found that in both of those cases, there was no premium for the fact that the land would be used as a landfill. Because the value is not in the land. The value is in the permits. And if you look at what's happened in this case, this goes back, I think... That's what allows them to draw the revenue stream, right? That's exactly, Your Honor, what allows them to draw the revenue stream. And part of what Mr. Herzog notes is that it is really, really hard to get those permits today. And projects are failing left and right in part because of cases like this that challenge landfills. And it is no longer the highest and best use of property to put it to a landfill use. And that's what Mr. Herzog concludes. He does a discounted cash flow analysis and he finds that the present value of the revenue from this project, as of 1997, would be $2.5 million. Far less than BFI invested and even less than Kaiser invested. But all those costs for Kaiser and BFI are sunk costs. The only way they're going to get that money back is if they can get the last and final piece of this puzzle put in place. And that, of course, is why we're here. Well, but landfills make a lot of money, don't they? They don't make as much money as they used to, Your Honor. And if you look at the discounted cash flow in Mr. Herzog's analysis, and it's right there. He explains what the tipping fees would be. He explains that, in this particular case, the costs of mitigation, of course, are astronomical. And all those funds have to be paid to the Mitigation Trust, which, of course, is administered by the National Park Foundation for the benefit of Joshua Tree National Park. It is not as lucrative as one would think. And given the cost of permitting in this particular case... Why is Kaiser doing this thing? Kaiser's doing it because it invested millions and millions of dollars before the landfill crisis disappeared. So there's still a long-term need for landfill space. But the crisis that would have generated the profits that Kaiser was expecting has disappeared. And that's why LA Sanitation District came in, and it was a good deal, even though it was a loss. And, of course, we know from the record that BFI, which invested over $40 million, simply walked away from its investment. Because it didn't want to plug along as Kaiser has. So that's the answer to the highest and best use analysis, but there's another piece of it. And that's the piece that we present in our opening briefs and in our... You've got a landfill that's going to... how many years is it going to take to... It'll operate for over 100 years. 100 years. And the panel asked a good question about why is the East Pit being filled last. The reason is because the East Pit is the lowest part of the landfill. And although you'd think you'd start at the bottom and work your way up, that's not how landfills are done today. They start at the top and they work their way down because if there's any leachate problems, you can see it and you can fix it. So that's why the East Pit is at the end. And there's also, in response to another question that was asked, a very good section in the ROD, where the agency specifically looks at the alternative of a landfill on other Kaiser property. And they look at all of the pits. And there's different reasons for each of those other three pits. I think one was too far away from the rail haul facilities and so there would be too... The emissions would be too great. One of them was too close to Joshua Tree National Park. It's in volume six, I think, of our excerpts of record. What's going to happen to all those holes? Well, the other three pits are not going to be filled and they're not going to be reclaimed. But the East Pit will be filled and will be reclaimed and the disturbed canyons, which are an eyesore, are also going to be reclaimed. So the other pits are just going to be left as they are. That's right. I think that actually is one of the ironies of this case. On the one hand, the plaintiffs have said this landfill is too big. On the other hand, they say the landfill is too small. There are very good reasons why those pits can't properly be filled. The agency looked at those issues and issued a reasoned analysis. If I could just spend one second... You know, you see, because we don't want some more Berkey pits out there. Do you know where the Berkey pits are? I don't, Your Honor. They're in Duke, Montana. Okay. They look like the gateway to hell when you look at them. Yeah. But I thought that in this modern day, as you had the strip mining going on, that they were being backfilled, you know. They saved all the waste and all the rest of it and put it in. And then all of a sudden you see grass and rainbirds and golf courses and all that. Well, the active mining on this area ceased in 1984, I think it was. And that was not how they were doing mining at that time. The picture that I provided to you... Yeah, I saw that. Very good. It is just a destroyed and scarred area. And it will be reclaimed. So someday there will be a top layer of fill and it will blend in in a way that it does not blend in today. If I could spend just a few seconds on purpose and need. The panel asked a lot of questions about where is it that the agency looked at alternatives to this project. The agency actually looked at several alternatives, one of which, of course, was the preferred action. They looked at ways of putting the landfill on Kaiser land only. They looked at reduced volume. They looked at different ways to get the waste there. And I think in a sense one of the most important alternatives, of course, was the no action alternative. And that legally is where in a private applicant project a lot of the analysis necessarily takes place. This, of course, is the issue that the court here addressed in the city of Van Buren case that is cited in our papers. We have a private applicant. This private applicant wants to use its property. And so the government is responsible for deciding whether that project should go forward. Separately, as Ms. Roundtree mentioned, the agency does a public interest analysis. But as to the purpose and need discussion, in the no action alternative there is a very detailed discussion of increased recycling, landfill, mining, and other issues of public concern that could have, if they were appropriate and sufficient, avoided the need for this land exchange. And the agency properly considered that in accordance with its obligations under city of Van Buren and similar cases, decided that those alternatives would not be in the best interest for this applicant or for the public. And the public interest analysis, which is another area where the district court found the decision wanting, is very, very comprehensive. The IVLA in particular hit that issue very hard. This is a good project. The IVLA noted that it was a good project. The BLM noted that it was a good project. And the California Court of Appeal noted that it was a good project. And we rely, of course, very heavily on the California Court of Appeal's decision. It's not mentioned in any of the plaintiff's papers. And it's not mentioned in the district court opinion. And that's very significant. The only issue remains, of course, is Herzog. And we've explained multiple ways that this court can properly address that issue. Thank you. Thank you. Okay. Good morning. My name is Noah Long. I represent the National Parks Conservation Association here. And I'll be discussing the Federal Land Policy Management Act issues and the NEPA issues with regard to the purpose and need statement and the range of alternatives, leaving all the other NEPA questions to my colleague, Stephen Volker, who represents the Sharpies. And if your honors will allow, we'll also split our time. The heart of this case is a federal project to divest these lands on the border of Joshua Tree National Park here. And what happened was a classic bait and switch. When it came to the supposed justification for the project under the Federal Land Policy Management Act, they claimed an overwhelming need by the public for a landfill. But when it came to valuing that same land, they ignored the proposed use and what was considered the most likely use. And Desert Citizens is completely dispositive of that failure with regard to valuation. The arguments by the defendants with regard to the Herzog report are problematic. What does that mean, problematic? I mean, that's a lawyer slapping the face. What does it mean? It means that they fail, your honor, in this case. The Herzog report, first of all, is a post-decisional rationalization for the original value. It's not a new appraisal that was before the agency at the original time of the appraisal or at the time of the record of decision or even before the IDLA. The Herzog report furthermore failed because it makes the same error that the appraisal and Desert Citizens made, which is to say that part of its analysis, which claims that it would be unfeasible to do a landmine on this particular site, is based on the fact that it's not permitted or it's difficult to permit. And there in Desert Citizens they said lack of permitting is insufficient to rule out the most probable use, which is the purpose of the federal project, to create a landfill. And there also the Herzog report fails because, as Mr. Feldman noted in the opening pages of his brief, this project was nearly completely fully permitted by the time of the record of decision, and so it shouldn't have played any role with regard to the financial feasibility. In fact, the only remaining state permit was issued only four months after the record of decision, and that would have been fully available to Mr. Herzog when he did his analysis. The remaining component of Mr. Herzog's analysis is a claim of lack of market demand. Now that's the supposed justification for the project. Not some incredible, I'm sorry, some long-term possible demand for a landfill, but an incredible need right now that justifies trading off lands on the border of Joshua Tree National Park. And that's why they wanted to do the project, but when it came to valuing the project, they're claiming that there was no need to value it as such because there was no market demand. Now that's just a classic bait-and-switch. Turning, if I may, to the basic outline of the Federal Land Policy Management Act. The Federal Land Policy Management Act makes it the policy of the United States government to, and I quote, public lands be retained in federal ownership unless it is determined that disposal of a particular parcel will serve the national interest. And that's a high burden, and here the federal government has simply failed to meet it. They've done so because they've conflated Kaiser's private interest in a landfill on this particular site with any legitimate or possible public interest in trading away these lands. It's kind of hard to say, I was just digesting that statement, and it's kind of hard to say that a landfill in Southern California is not the public interest. Well, the public interest, we're not saying, and we don't claim in our brief, that there's not a possible legitimate interest in increased waste management services, which might include various landfills here. But what they did is that they made this particular landfill the purpose and need of the project. And as Judge Pye noted just a few moments ago, making this particular landfill the purpose and need of the project, it conflated the possibility of a legitimate need for a landfill and narrowed it down and screened out any alternatives which might have met that generalized public need in a landfill because they wouldn't meet Kaiser's need in this particular landfill. And that's where the NEPA document's error is because, as Mr. Feldman noted, the CEQA documents, which were discussed by the state courts, were to discuss the permitting of a private landfill. Now, that question is distinct from the federal project here. The federal project was land divestment under the Federal Land Policy Management. The land exchange. Right, the land exchange. Right, so there they had to, in order to analyze that, they had to consider whether or not there was a public purpose which would meet the FLPMO requirements for a landfill. That would require a range of alternatives that were simply excluded here because they wouldn't have met Kaiser's private interests. Those included, as Your Honor noted, income from this particular landfill to Kaiser, profitable use of their mining byproducts, development of Kaiser's company town. Now, there's simply no legitimate public interest in those private purposes. And to the extent that the purpose and need statement screened out any alternatives that wouldn't meet Kaiser's private interest in that project, the NEPA document failed. Furthermore, the record of decision which outlined these supposed interests failed on a number of regards. First of all, What would you do with those terrible scars and holes in the ground? Your Honor, you know, I'm also upset by those terrible scars and holes, but the fact is that they're not on federal land, and BLM, as a land management agency, notes in its own brief that it doesn't have a responsibility to Kaiser to restore these lands. Have you been out to look at these things? No, Your Honor, I haven't had the opportunity. You haven't been there? No, I haven't, Your Honor. But you're upset by them. Go ahead. Yes, sir. I believe that the relevant question is whether or not we've been to Joshua Tree, which would be impacted by these. Have you been to Joshua Tree? Again, I haven't, but my colleague here just went last week and took photographs. She hasn't been either. Who's that? Never mind. Okay. I mean, don't try to over-theatricalize your position. I have no intent to over-theatricalize. The point is that the record of decision points out a number of purposes for the project. Those purposes are either conflations of Kaiser's private interest, or they're not substantiated by the record. I'll be honest with you. One of the troubles I've had in the past with, not all the time, but with environmental groups, they exaggerate and they hide the ball, you know, and they like to evade answers to questions. So it's better that you just come clean, you know. Let us know if you haven't been out there. I haven't been out there, Your Honor. I haven't been out there. You're upset of scars and you haven't seen them. The Land Folicy Management Act doesn't exclude private interests. No, it doesn't exclude private interests. So in other words, you know, it wasn't as though BLM sat down and said, ah, Southern California needs a landfill. Let's see what we can do to accomplish that. It worked the other way. Kaiser said we have this land and we think there's a potential here for a landfill. In order to make this work, at least we think we can make it work, or we would like to make it work, is we need to get some additional land. Right. We'll go to the feds and we'll say here's what we want to do. Here's the reason why we want this federal land. We'd like to swap with you. And it's to construct a landfill. Just what happens when it's going to be the largest in the United States and whatnot. Right. That's exactly right, Your Honor. It seems to me that BLM has to, to some extent, it has to consider Kaiser's private interest. Sure, it has to consider, but to the extent that it screens out any alternative to meeting the general public interest. Because once it considers, it takes in and says, okay, this is why Kaiser wants to do it. What are the alternatives? Tell us. Well, Your Honor, there's a range of waste management alternatives. Put water in there and make a big lake out of it? No, Your Honor. What's... You mean alternatives to restoring these lands? Yeah, what are you going to do with those holes? So, Your Honor, only one of the holes will be used by the landfill. It won't be used for 70 years. And the government admits that it has no proper place in restoring Kaiser's lands for them. That's not their duty. It's not their regulatory obligation. Okay. And it admits in the environmental impact statement that the preferable alternative with regard to the environment is the no action alternative. That is to say that doing nothing would be better for the environment than making this exchange. That's DLM's position in the environmental impact statement. But they go ahead and go on with it because of Kaiser's private interest in the project. Now, the justifications in the record of the decision aren't borne out because, as I said, they're either Kaiser's private interest or they just don't happen. The lands that they're gaining, supposedly there's a public interest in gaining these lands because they're going to increase the management capacity. But there are 10 dispersed parcels located on the rail line that will serve the project. And as part of the deal, Kaiser gives away a right of way, meaning that the only threat to these lands at all is the landfill itself. Your Honor, I see that my time here has expired, and I'd like to reserve time for my colleague, Stephen Golker, to discuss the cross-appeal and the remaining NEPA claims. Who's going to talk about sheep? He'll be talking about sheep, Your Honor. Thank you. Well, you know, we'll give you a little more time if you've got something to say. Your Honor, I believe that I've discussed all of the issues, unless there are further questions. Well, if you talk about these alternate uses, what else it could be put to? You mean what else the pits themselves could be used for? That's right. Your Honor, I'm not an expert in what the pits could be used for, but the BLM notes that that's not what it's going for here either. Only one of the four pits is going to be used by the project, and it won't be used for 70 years, meaning, in theory, if there's enough demand in 70 years, they'll keep filling up the federal lands until they get to it. But that'll be a decision that our, you know, not yours, but maybe our great-great-grandchildren, I'm not sure exactly. The real question, though, is there alternate uses to this, is there alternatives to constructing this large landfill? That's exactly right. Are there alternatives to constructing this large landfill? And at the same time that they were considering this, the Desert Citizens Landfill Land Exchange was going on. So the alternative to identify was, you know, they could build just on their own land. Sure. Without the federal land. They could do that, but I guess it would be smaller. Right, it would be smaller. And as they noted, there wasn't market demand for a landfill of this size at the time, according to their own litigation position. So they claim that there's public interest in a landfill, but then claim that there's not public demand for a landfill. Kaiser could opt to promote, or somehow or other, it could be more recycling. More recycling or diversion of waste. I mean, there's a range of alternatives, but those weren't considered at all, because they would have not met Kaiser's interest in a landfill on this site. How broad do you have to sweep those alternatives? The whole purpose for the land exchange is to build this landfill. Kaiser's purpose in the land exchange is to build the landfill, but if the government's going to be a party to that, there has to be a legitimate public purpose to it, and that's not just Kaiser's landfill. The legitimate public purpose might be... As Judge Gregerson said, you know, it's hard to say it's a landfill in Southern California. It doesn't have some public purpose. That may be, but it's the government litigating position that there wasn't a need for a landfill at the time. Where is that documented in the record? In the Herzog report, Your Honor, and I can cite you to it. Before that, is there anything in the record apart from Mr. Herzog's report that shows that there was no need for a landfill? No, Your Honor, there wasn't. The records claim the whole record is based on this need for a landfill, and there wasn't information before the record decision that showed that there wasn't, but that's because there wasn't analysis in the NEPA document into other alternatives. They screwed that up. If there's no need for a landfill, why do you think L.A. County made a deal with Kaiser? Your Honor, it was BLM that made a deal. Or BLM, whoever made it. You mean to transfer the land or to buy the... No, no, why would L.A. County, whatever it is... Sanitation. Oh, you mean that purchased the land from Kaiser. Why would they want to do that? Your Honor, they purchased it for their long-term use, I assume, but that's not evidence that there was sufficient demand to give away land on Joshua Tree National Park under the Federal Land Policy Management Act. So your real problem is the land was given away and it was sold too cheaply. That's one of the problems, Your Honor, and I think there are really two problems with the FLPMA analysis, the Federal Land Policy Management Act. First, they claim that there's this big demand without investigating if there's other ways to do it in the NEPA documents, and then when it comes to evaluating the land, they claim that there's insufficient market demand to generate a landfill and that there's no need for a landfill and they can value the land speculatively at $79 an acre. Now, in Desert Citizens, similar land not far from L.A. was valued at $350 an acre, and that was found to be arbitrary and capricious because they ignored the landfill. Here, the town site lands were valued at less than the monthly income that Kaiser was receiving from that, but they did that all because it would help Kaiser create profits from this particular site. You think there was a side deal made with Kaiser to get that federal land over real cheap? All I'm saying is that there was insufficient analysis, Your Honor, of the value and the appraisal. The value of the appraisal clearly failed under the Desert Citizens requirements of what the appraisal was supposed to consider. Go ahead. Thank you. Good morning, Your Honors. My name is Stephen Volker. I represent the Sharpheed Petition plaintiffs and appellees. We are also cross appellants. I would like to address our cross appeal points, if I might. Have you been out to these pits? Yes, I have, Your Honor. I would also add to the background portrayed by the government that they are visible from Joshua Tree National Park to the northeast. I have personally been there and observed them from the park at that location. If I might proceed. Thank you. Our cross appeal raises two issues. The first is whether or not the trial court properly dismissed our third claim for relief, which asked the court to examine the conduct of the National Park Service in this case. The law applicable is one of standing. The court ruled that we lacked standing because we could not show that our injury from the Park Service's entry into the Memorandum of Understanding was not redressable. We believe it is redressable under both NEPA and under the Park Service's Organic Act and the Desert Protection Act. Under NEPA, the court's standard of redressability is a relaxed one because NEPA is a procedural statute under Massachusetts v. EPA and cases cited therein, whereas here a procedural injury is alleged. The petitioner need not show that the correction of the procedural. The Park Service, I understand, it wasn't the agency responsible for preparing the EIS. The Park Service actually bore both regulatory and contractual responsibility to share in preparation of the EIS. Let me explain, Your Honor. There are two statutes, rather there are two regulations that are on point and a contract as well. 40 CFR 1501.6B3 directs that each cooperating agency shall assume, on request of the lead agency, responsibility for developing information and preparing environmental analyses, including portions of the environmental impact statement concerning which the cooperating agency Well, they may have supplied information, but the final agency decision here that's at issue is BLM. There is, independent of BLM's responsibility, Your Honor, a duty on the part of cooperating agencies with Well, they may have an obligation to cooperate and provide information so that the primary agency can do the necessary environmental workup, but it looks to me like the final decision maker here is BLM or the board. Well, I believe that there is a separate duty placed by the regulation on a cooperating agency, and the reason is a good one. The kinds of environmental issues that are posed by major projects such as this require for their informed resolution consultation with a variety of agencies, whereas here the National Park Service has special expertise with regard to its management of the nearly adjacent Joshua Tree National Park and, moreover, has been asked by BLM in 1995 to enter into a contract pursuant to which the Park Service would participate as a cooperating agency in the joint preparation of the EIR-EIS and will assist in development of proposed alternatives and related monitoring and adaptive management strategies which will afford maximum protection to Joshua Tree National Park. So what's the justification for telling the Park Service you didn't cooperate sufficiently? Well, there's a specific duty, Your Honor, not only to share information that the Park Service Undo the memorandum of understanding pursuant to which the Park Service withdrew its sharp criticism both of the project and of the adequacy of the EIS. The Park had submitted over a series of years a number of lengthy criticisms of the project and of the EIS, culminating in a 38-page single-space comment letter in which the Park took the EIS and BLM to task. The Park was the primary steward here of the federal lands with the greatest resources that were most at risk here, the Joshua Tree National Park. It's 800,000 acres, much of its wilderness. The Park had obvious expertise. That's why BLM recruited the Park to participate in the preparation of the EIS. In addition, the Council on Environmental Quality, which is responsible for developing and explaining the President's NEPA guidelines, took the position that where a cooperating agency is involved, that it has a special duty to comment, in other words, to share with the public the criticisms that it has of an EIS. And I quote from the 40 frequently asked questions published at 46 Federal Register 18026 in 1981 at question 14C, quote, if the cooperating agency determines that a draft EIS is incomplete, inadequate, or inaccurate, or it has other comments, it should promptly make such comments. So those comments help inform the public debate about whether the EIS is adequate and what are the environmental risks posed by the project. Let me suggest something, and you certainly don't have to. My own assessment of this particular issue is a tough one. And Judge Trott has lots of problems or concerns about the sheep. And I understand you're knowledgeable about the sheep. You're the sheep guy. You know, our time is getting short. All right. I mean, I get your point on this one issue. Tell us about the sheep. All right. Thank you. So move off of our cross appeal. Thanks for the guidance. With respect to bighorn sheep, the district court focused on the lack of comprehensiveness and clarity in the EIS. You know, I think that's ridiculous. I have to tell you. I mean, I've read all these studies. They've got airplanes in the air tracking these sheep, trying to figure out where they are. They're taking this buffer zone. They realize they're going to have to relocate some water. So they said we're going to put in water sources and allow these water sources for one year so that the new water sources will become the sheep will become habituated to the new water resources. They've got maps. They've got everything under the sun to say is the district court did that. This is far too theoretical. Strikes me as nonsense. I mean, I've been reading this stuff, looking for it until my eyes are crossed. I can't find of anything they don't do. Well, I think that's part of the point. I agree with you, Your Honor, that one would expect a federal agency with the resources at play here would distill the key analytical features of a proper bighorn sheep impact analysis into the EIS and make it clear in that document, for example, what is the width of the buffer zone? Will it have gaps in it? How will it function? How will it... That's nitpicking. They're still trying to figure out where these sheep are. They're trying to relocate them away. And they point out the buffer zone is both going to be habitat and an attempt to keep them away from the area. And new water sources will be placed in habitat for at least one year before water sources are removed to enable sheep to habituate to new water sources. These new sources will be maintained throughout the life of the project. The sites and designs will be selected and or approved by biologists from the BLM, California Department of Fish and Game, and UNLV. And then they talk about the best location. So this is an ongoing mitigation process, including trains that don't even move fast to figure out where the sheep are going to go. You kind of approach this thing as though it's a fixed picture. It's not. They don't know how the sheep are going to really react to this. And so they're studying all over the place. And to say this is theoretical in a sense to state the obvious. They're going to monitor all this stuff as it goes along and deal with these sheep. Anybody can say they didn't take a hard look. It just strikes me as incredible. They also talk about the fence. It's going to be high enough to keep the tortoises in one place, but not so high as to stop the sheep. And the district court doesn't even understand that because the tortoise-proof fencing may disrupt the sheep's migration patterns. It seems to me they've taken that into consideration. What is it, an 18-inch high fence? The sheep can walk over that in a second. I mean, the same thing is true with eutrophication and air quality and all the rest. The more I go through looking for what is in here, you know, you have to dig deep. You find discussion of all of this, including the words eutrophication, nitrates, winds, automobiles. They looked at this thing. The cows are coming home. I think there are a couple of key points that animated the trial court's ruling in this case, and I share his perspective. Let me explain why. The first is this court has held repeatedly, most notably in the state of California v. Block, that a federal agency may not bite off more than it can chew in a single approval, such that it doesn't disclose the potentially significant impacts on key impacted areas of the environment. They do disclose. Two pages before, they've got all these terrible things that could possibly happen to the sheep. That's why you've got these amazing mitigation features that are going in. That's exactly what they're supposed to do. The trial court found, and I agree, that the analysis of the mitigation measures is completely incomplete. It defers to future reviews a definition of the width of the buffer zone. It fails to explain how providing a buffer zone within existing habitat protects the sheep. It appears that the buffer zone, in fact, takes away some of the existing habitat. It fails to explain... They recognize that, and that's what they're mitigating. Well, the other point here is that if you don't do sufficient study before you publish the EIS, and you simply say that we're going to conduct an adaptive management deferred mitigation analysis so that when we will monitor the effects as they unfold, and we will react to them as they unfold, and we will conduct a future study... To my way of looking at this, what I'm meaning is you're completely misrepresenting what they did. They take a look at all this, they figure it out, and they say, okay, this is the way it appears based on all the studies that we've done, and here's what we're going to do to try to mitigate all of this, and they put in this specifically the 644 acres. They're going to relocate sheep, put in new watering things, make sure the tortoise fences aren't a problem, slow the trains down, and then instead of saying, that's it, and we walk away, they also say we're going to monitor this, and they set up money for it, and committees, and trusts, and everything under the sun. I think that's precisely what you would want. It's a trust us approach, Your Honor, and if the mitigation measures have performance guarantees, specific performance criteria such that you can predict with certainty that they will work, and if they don't work, the project cannot proceed, that's one thing. But here, for example, the... And if they had guarantees, you'd be saying these are ridiculous. Nobody knows what's going to happen. Things don't work that way. I think you've exhausted the subject. Where do your clients live on this map and on these pictures? To the east and south, some of them. There's nothing in here at this point. Is north the top of this picture? I've never seen that picture. It wasn't circulated to counsel. No, not that picture. They walked by it. I just showed it to you. You want to see it? Here, take a look at it. Well, the clerk will hand it to you. You know, I'd like to know where your clients live. I mean, I see that down below, I think on the right side there, that dark mountain looks like a subdivision. This is a little hard. The east pit is seen from the South Hall Road. So it appears that this is looking to the west. And so in the picture on page 33687, Joshua Tree, I believe, would be to the north or to the right. So it's not depicted. Are there shadows on that? You know, I can't tell which is north and south on this map. I apologize. It would seem that if the sun is in the middle of the day, then we're looking actually to the east. Okay. I have not flown over this in a plane. If we're looking to the east, then the environmental organizations reside primarily off to the south, which would be to the right on this map. What's that subdivision down there? Oh, I'm sorry. I was looking at 687. The subdivision. I was looking at 33692. Looking southeast. That may be the town site, actually. I have driven through there. It's pretty big on this map. But I think that must be the town site, which had a prison and had a number of buildings. So if that helps the court. And that being the case, then Joshua Tree National Park would be to the left on 692 or to the north. It shows you the mountains, so you know where the mountains are. Yes, Joshua Tree extends to the east of this location, and you can see sort of the southernmost extent of Joshua Tree and the mountains on the upper left of this picture. When all the dust settled, where was the National Park Service on this issue, on this project? The National Park Service abdicated its responsibility to maintain its criticisms of the EIS until they were resolved. Instead of commenting on the final EIS, which came out in January 1997, in December 1996, the Park Service entered into a memorandum of understanding basically squelching its dissent and requiring it to say no ill of this EIS, which was flatly contrary to its prior authoritative comments. In some details, we explain in our briefs at least a dozen major criticisms. I bet it sounded like somebody paid them off under the table. It was over the table. The Kaiser MRC made a contribution to the National Parks Foundation. That's a congressionally chartered private foundation whose purposes are to assist in conducting studies to promote better park management. So it seems like it's a good deal. Our concern is that if a steward of the national park system can be basically brought to heel by private interests and muzzled without our ability to examine the motivations and the facts underlying that decision, that that is a tragedy for our nation. We should have the right under NEPA and under the California Desert Protection Act to conduct limited discovery, which we ask the district court to allow us to do, in order to ascertain whether in fact these matters that were off the public record and resulted in this abrupt withdrawal of comments just two months after the last searing comment had been delivered to BLM. Withdrawal of the one guardian of the public's interest. That's a shame. Did the district court handle this matter by way of summary judgment sui sponte? Yes. We had filed a motion to file a third amended complaint, I believe. And the court, on its own motion, struck the third claim in that proposed amended complaint. And at the same time, we had interposed a discovery and request to conduct depositions. And that, of course, was state until the court ruled. And when it issued an order directing us to respond to its order to show cause as to why this claim should not be dismissed, we briefed it after the court ruled we were unable to conduct a discovery. So this court, under the applicable rules of procedure, must assume that the facts alleged in that third claim for relief are correct. And that's the test as to whether, under that state of facts, it's appropriate that the Park Service can turn a deaf ear to its own expertise and to withdraw its sharply critical comments of this project from public view. And it deprived the public of an opportunity in reviewing the final EIS. Well, if you didn't move for a summary judgment, why is this order called Granting in part and denying in part Plaintiff Donna and Lawrence Sharpkid's motion for summary judgment. There were two rulings, Your Honor. The dismissal of our third claim for relief came earlier, and there wasn't a final judgment. We awaited the final judgment entered by the court here. The court reviewed the first two claims for relief in our complaint, which had to do with the Federal Land Policy Management Act and NEPA, but did not review our claims against the National Park Service because it had previously dismissed those claims. And we had explained that history in our briefing, Your Honor. It's a little confusing because we're an appellee, so the majority of our brief has to do with the issues raised by the appellant. But we also did brief, I think sufficiently, the issue before the court, which is whether we had standing to pursue that claim and whether the trial court thus should be directed to resurrect that claim so that we might have our day in court. All right. Thank you very much. All right. This matter will stand. Any more questions? I don't know if they want to respond. You want to respond? That's good. Yeah, all right. Okay. As to the question of the Sharpkid's claim of procedural standing. Where do they live in this picture you gave us? I don't know. Where do they live? The Sharpkid's live. In the picture? I'm sorry, I wouldn't be able to tell you, Your Honor. Where's Norris on the picture? I don't even have the picture before me, and I don't even need it. Once you get photocopied. I do not know where they live on that photo. I wouldn't be able to show you. I apologize. For each of the statutes under which the Sharpkid's have based their claims of procedural injury, they have failed to allege that they've been deprived of procedure that the National Park Service is under any statutory or regulatory obligation to provide. And that's the problem. They haven't identified a procedure with which the National Park Service is actually tasked as being the source of their procedural injury. Let me just say they were asked to cooperate, and they essentially withdrew their cooperation. Oh, indeed not. No, they did cooperate. Well, you made this last remark. It's the government's position that in entering into the agreement that was part of their cooperation, that's what they chose to do. And in all instances, I'd just like to make clear, you were absolutely right, Judge Payette, for all purposes of this case, the National Park Service was, I don't mean this in a derogatory way, but nothing but a cooperating agency. They had no independent decision-making authority in this case, and therefore, actually, it's bottom line. It's a BLM thing because it's a land exchange. Indeed. I would simply also like to address the confusion that the plaintiffs have made in terms of statutory requirements and also some of the analyses alleged. The plaintiffs have alleged that there's some tension between the government's position on the public interest analysis and the highest and best use analysis. The public interest analysis, which falls under FLTMA, does look to seek and determine what is it that the public needs, what would well serve the public. And, for example, is there a need for a landfill? The highest and best use analysis, in contrast, simply looks at a piece of land and seeks to determine, for example, in this case, what's the best use of these fragments of land? So the questions are entirely different, and there is no tension here in the government's position on each of these issues. As to Mr. Herzog's report on the landfill, he didn't say that the landfill use wasn't feasible here for legal reasons. He didn't say that the permits had anything to do with the feasibility, in his opinion. Indeed, he actually assumed, just for the sake of argument, that the legal feasibility and the physical feasibility were there. He looked solely at financial feasibility, and for reasons including, for example, BFI, the waste company that lost over $40 million because they just decided to walk away from this deal. Mr. Herzog ultimately concluded, after an exhaustive analysis, that financial feasibility in terms of the landfill is the reason why, or for purposes of the landfill, is why it's not a highest and best use. The only question I have left is, are we free just to consider that? Free to consider? The Herzog report? The Herzog report. It's not part of the record that was before the board. It came afterwards. That's correct. It came afterwards in response to the extra record evidence that the SHRP then introduced after they first raised, for the first time, the highest and best use analysis issue after Desert Citizens. That decision was rendered by this court. So it was simply in response to what was now already before the court at the hands of the SHRP. Two questions. Exactly what do you want us to do on your appeal? What are you asking us to do? How would you like the order to read? For purposes in general or for purposes of highest and best use? What do you want us to do? What do you want us to do? To approve the IVLA's You want us to grant summary judgment in your favor? Is that what you're asking us to do? Reverse the district court? What do you want us to do? To affirm the decision of IVLA and the district court affirmed in part and reversed in part or set aside in part. It's simply just to say that the IVLA decision Affirm the IVLA decision. That's correct, Your Honor. And what are you asking us to do on the cross appeal? To find that the district court correctly found that the Sharpies do not have standing. Say those last few words. To affirm the district court's decision that the Sharpies do not have procedural standing to bring their claims against the National Park Service. Okay. All right. Just one more point on the question of purpose and need. The plaintiffs have incorrectly stated what that statement is about. It falls under NEPA and it doesn't seek to find out or determine what the needs of the public are. Under 40 CFR 1502.13 it specifically states that the purpose and need statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action. So again, as I spoke earlier, it was a place for the government to set forth what action it was looking at. And clearly here it was appropriate for BLM to indicate that it was the land exchange and the proposed landfill. Thank you. Land exchange. Is this the last word? The land exchange and the proposed landfill. And the what? And the proposed landfill. And the proposed landfill. Yes, Your Honor. All right. Thank you, Your Honors. If I could just have 60 seconds. I just wanted to follow up on two points that I made earlier. One is I made the argument and we did in our briefs that the state court's decision is a very, very significant event in the history of this project. The argument that we heard from plaintiffs was that it doesn't address highest and best use. And that's very telling because it does address every single other issue in this case. And as we point out, it's not preclusive here. It certainly has a profound impact on how a court should address these issues. The other point that I made that plaintiffs didn't follow up on is with regard to HRTSA. It's not just that the HRTSA materials were put in front of the district court. They were, but they were considered by the agency. And the agency issued a decision first by the chief state appraiser and second by the district manager saying that... It wasn't considered by the board. It wasn't considered by the board and that's the point that I want to make. Because when the district manager issued his decision, and I think it was 2003, there was a 30-day appeal period. It was a final decision of the agency on the HRTSA materials. It was provided to these plaintiffs. They had 30 days to appeal that to the IBLA and they didn't. What would they appeal? They would say that the district manager was wrong in approving Mr. HRTSA's analysis. The decision of the district manager was that there was no reason to go back and read this. Why? Well, there was a little bit of dispute in the record, but as I understand it, our review is of the... What's it called? A board of land... The IBLA. Yeah, the IBLA. So that's the decision that's at stake. The HRTSA report is not... If you would just look at that record that was before the board, the HRTSA decision is not part of that. And that's our decision. Our task here is to look at the board's decision. Now, there are certain circumstances when you can augment the record. And I don't know that this... I haven't really thought through all of this yet, but... I can't tell if it's clear that the district court actually did that. The district court purported to have reviewed the record, both on the pleadings in the district court case and the administrative record, and he did not acknowledge in any way the HRTSA materials. So then he didn't consider it. He did not consider it. And our position is that was error. Because the answer to the highest and best use issue can be found both in the Yerke analysis, as Ms. Browntree mentioned, but even more so in the HRTSA analysis. So, again, what we have... We put in our briefs, I think, five or six different reasons why that material isn't properly before this court. But the one I want to end with is this one. And that is that, again, as I said earlier, we have an agency here that did exactly what a court would want an agency to do after a new and important decision came out. The district court, in contrast, did exactly what this court has said in Warm Springs, and citizens of the Clearwater shouldn't have them. And that was to remand an issue to an agency to answer questions that they've already answered and discuss issues that they've already discussed. And that is what is completely inappropriate. Well, you know, they just stood up and argued that the HRTSA... Even if you took the HRTSA report into consideration, it's inadequate under our recent case of Desert. Right, and that's a very different issue. So that seems to me... But if I could... We have to be careful. If I could address that... Because we don't want... We're not the district court. We don't want to substitute our role for that of the district court. No, but it's de novo review. And so this court can look at the HRTSA materials and address those issues. But the significant point is that in Desert Citizens, that analysis was missing. And that was what Desert Citizens talked about. In our case, the analysis is here. And, of course, plaintiffs had nitpicked it. But that's all they've done. But, again, the important point is that the agency... An important point is that the agency subsequently approved Mr. HRTSA's analysis. And these plaintiffs did not appeal that decision to the IDLA. Okay. And so it's final. Okay. Thank you, Your Honor. Thank you. And we have good arguments on all sides. And we appreciate those. And all the help that you've given us. And we'll now recess until 9 a.m. tomorrow morning. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Pregerson, Trott, Paez